UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

INGE G. BEHREND,

       Plaintiff,

   -against-

JOEL KLEIN, CHANCELLOR OF THE NEW YORK
CITY BOARD OF EDUCATION, individually and in his
official capacity, MICHELLE LLOYD-BEY,
individually and in her official capacity as Community
Superintendent of District 27, LAWRENCE BECKER,
individually and in his capacity as Chief Administrator,
Division of Human Resources, and THE NEW YORK
CITY BOARD OF EDUCATION (d/b/a The New York
City Department of Education),

       Defendants.
----------------------------------------------------------------------X

**MEMORANDUM & ORDER
04-CV-5413 (NGG) (CLP)**

BETH HUDSON,

       Plaintiff,

   -against-

JOEL KLEIN, CHANCELLOR OF THE NEW YORK
CITY BOARD OF EDUCATION, individually and in his
official capacity, MICHELLE LLOYD-BEY,
individually and in her official capacity as Community
Superintendent of District 27, LAWRENCE BECKER,
individually and in his capacity as Chief Administrator,
Division of Human Resources, and THE NEW YORK
CITY BOARD OF EDUCATION (d/b/a The New York
City Department of Education),

       Defendants.
----------------------------------------------------------------------X

**MEMORANDUM & ORDER
04-CV-5414 (NGG) (CLP)**

1

NICHOLAS G. GARAUFIS, United States District Judge.

Inge G. Behrend ("Behrend") and Beth Hudson ("Hudson") (collectively, "Plaintiffs")

bring this action under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States

Constitution, alleging that the above-captioned Defendants (collectively, "Defendants") deprived

them of property and liberty without due process of law by revoking their New York City

teaching licenses and by placing them on the New York City Department of Education (the

"Department") "Ineligible List." Currently before the court are Plaintiffs' and Defendants'

cross-motions for summary judgment. For the reasons set forth below, Defendants' motions are

GRANTED and Plaintiffs' motions are DENIED.

## I.     FACTUAL BACKGROUND

The following facts are undisputed, unless otherwise indicated.

### A.     New York City Hiring and Disciplinary Procedures

Before teachers can begin working in a New York City public school, they must first

obtain a city teaching license from the Department. These licenses, which are limited to specific

teaching functions and grades, allow a teacher to work in any of the city's 32 school districts.

(Behrend 56.1 Statement ("B 56.1") (Docket Entry # 131) ¶ 3; Hudson 56.1 Statement ("H

56.1") (Docket Entry # 128) ¶ 3.) Before granting a license, the Department verifies that an

applicant has a state teaching certification, conducts an interview, takes fingerprints, and

performs a background check. (B 56.1 ¶ 4; H 56.1 ¶4.) A newly hired teacher works on a

probationary basis for three years. During this probationary period, the Department monitors the

teacher's performance. If the teacher successfully completes the three-year period, she (or he)

receives tenure. (See B 56.1 ¶¶ 8, 9; H 56.1 ¶¶ 8, 9.)

If the Department is not satisfied with a teacher's performance during the probationary

period, however, it has at least three options. First, the Department can issue an unsatisfactory

rating and a description of problematic conduct. Second, the Department can "discontinue" the teacher's probationary service at a particular school. Third, and finally, the Department can terminate the teacher's New York City teaching license. Chancellor's Regulation C-31 enumerates grounds for license termination ranging in seriousness from "incompetent and inefficient service" to criminal misconduct. Once a teacher's license has been terminated, the Department places her on an "Ineligible List" that prevents her from being hired in city schools. (B 56.1 ¶¶ 17, 18; H 56.1 ¶¶ 19, 20.)

The Department's disciplinary options have differing impacts on a teacher's career. A teacher who receives an unsatisfactory rating or whose probationary service is discontinued remains eligible to apply for positions in other city public schools. (B 56.1 ¶ 58; H 56.1 ¶ 60.) If, however, a teacher's license is revoked and she is placed on the "Ineligible List," she is barred from teaching in New York public schools, at least until she is able to successfully reapply for a license. (B 56.1 ¶¶ 17, 18; H 56.1 ¶¶ 19, 20.)

New York City teachers are entitled to review of the Department's disciplinary decisions. Under Chancellor's Regulation C-31, there is a single hearing process for reviewing unsatisfactory ratings, discontinuances, and termination of city teaching licenses. Appellants may present evidence, call witnesses, cross-examine opposing witnesses, and make an oral presentation. (See Defendants' 56.1 Statement – Behrend ("Def. B 56.1") (Docket Entry # 123) ¶ 19; Defendants' 56.1 Statement – Hudson ("Def. H 56.1") (Docket Entry # 121) ¶ 20.) During the hearing, they may only be represented by an advocate selected by the teacher's union. (B 56.1 ¶ 26; H 56.1 ¶ 31.) In practice, these advocates are not attorneys. (B 56.1 ¶ 29; H 56.1 ¶ 34.)

## B. Facts Regarding Behrend

Behrend first worked in the New York City public schools as a substitute teacher. She held this position from 1988-1989 and again from 1993-1997. Then, from 1997-2002, she worked as a teacher's assistant. In September 2002, Behrend received two New York City teaching licenses. One license authorized her to teach early-childhood classes, the other authorized her to teach elementary students. (B 56.1 ¶ 1.) In September 2002, the Department hired Behrend as a probationary teacher to work at PS 108, an elementary school in South Ozone Park, Queens. (Id. ¶ 5.)

Behrend received a formal rating of "S" (or "satisfactory") for her first year, the highest rating that a probationary teacher can receive. (Id. ¶ 10.) During the course of her second year, however, she received several unsatisfactory classroom observations and at least one disciplinary letter. (Id. ¶ 11.) At the end of that year, Behrend received an unsatisfactory rating. (Id.) On June 15, 2004, the regional superintendent mailed Behrend a letter informing her that, in one month, she would be reviewing whether Behrend's probationary service should be discontinued and her city teaching license terminated. (Id. ¶ 13.) The superintendent's letter stated that the proposed action stemmed from Behrend's unsatisfactory classroom observations and disciplinary letter. (Id.) The superintendent's letter also advised Behrend of her right to file a written response, which Behrend did. (Id. ¶¶ 13, 15.)

On or about July 14, 2004, a new district superintendent, Michele Lloyd-Bey, wrote Behrend, indicating that she had decided to "reaffirm" the discontinuance of Behrend's probationary service and the termination of her license, effective at the close of business on July 21. (Id. ¶ 14.) It is unclear why Lloyd-Bey's letter used the word "reaffirm," but there is no indication that she – or anyone else affiliated with the Department – had previously taken any

disciplinary action other than issuing an unsatisfactory rating. The Department notified Behrend, via a letter dated July 30, 2004, that she had been placed on its "Ineligible List." (Id. ¶ 17.)

Behrend appealed the discontinuance of her probationary employment and termination of her license on or about October 21, 2004. (Id. ¶ 33.) An evidentiary hearing was held pursuant to Chancellor's Regulation C-31 on December 21, 2004 before a three-member committee. (Id. ¶ 34.) A majority of the committee recommended the reinstatement of Behrend's probationary employment and the restoration of her license. (Id. ¶ 36.)

Brian Osborne, a Chief of Staff to the Deputy Chancellor, reviewed Behrend's case and decided not to follow the committee's recommendations. (Id. ¶ 40.) Accordingly, the Department mailed Behrend a letter notifying her that the discontinuance of her probationary employment and termination of her license had been reaffirmed. (Id. ¶ 47.) Behrend did not receive any additional explanation for the Department's action, nor was she informed of the committee's recommendations or provided with a copy of its report. (Id. ¶¶ 42, 45.)

After Behrend received notice that her license had been terminated, she applied for teaching positions at public schools outside New York City. These schools asked Behrend whether any of her teaching licenses had ever been terminated. After Behrend disclosed the termination of her city teaching license, she was not hired. (Id. ¶ 59.) There is no evidence, however, that the Department itself disclosed any information regarding the termination of Behrend's license to potential employers. (Def. B 56.1 ¶ 29.) Behrend eventually obtained work as a teacher at three different private schools. (Id. ¶ 26.) At no time did Behrend ever commence a proceeding under Article 78 of the New York Civil Practice Law to challenge any of Defendants' disciplinary actions. (Id. ¶ 27.)

### C. Facts Regarding Hudson

Like Behrend, Hudson first worked in the New York City public schools as a substitute teacher. Hudson worked in this capacity from 1996 to 1998. In February 1998, she obtained New York City licenses to teach early childhood and elementary school classes. (H 56.1 ¶ 1.) In September 2003, the Department hired Hudson, on a probationary basis, to teach bilingual special education kindergarten classes at PS 108 in Queens, the same school at which Behrend was employed. (Id. ¶ 5.)

Hudson generally received satisfactory reviews during her first few months on the job. Before the year ended, however, she received a disciplinary letter and two unsatisfactory classroom observations. (Id. ¶¶ 10-13.) At the end of the school year, Hudson was given an unsatisfactory rating. (Id. ¶ 14.) On June 15, 2004, the regional superintendent mailed Hudson a letter stating that, in one month, she would be reviewing whether Hudson's probationary service should be discontinued and her license terminated. (Id. ¶ 16.) The letter explained that the proposed action was based on the disciplinary letter and unsatisfactory classroom observations. The letter advised Hudson of her right to file a written response, which she did. (Id.; Def. H 56.1 ¶ 10.)

On or about July 14, 2004, the new district superintendent, Michele Lloyd-Bey, wrote Hudson, indicating that she had decided to "reaffirm" the discontinuance of Hudson's probationary service and the termination of her city teaching license, effective at the close of business on July 21. (Id. ¶ 17.) As with the similar letter sent to Behrend, it is not clear why Lloyd-Bey used the word "reaffirm." Hudson also received a letter dated July 30, 2004 indicating that she had been placed on the Department's "Ineligible List." (Id. ¶ 19.).

Hudson appealed the discontinuance of her probationary employment. She did not, however, separately appeal the termination of her license, apparently believing that reversal of her discontinuance would also result in the restoration of her license. (Hudson 56.1 Counterstatement ("H Counter 56.1") (Docket Entry # 129) ¶ 16.) Pursuant to Chancellor's Regulation C-31, an evidentiary hearing was held on October 19, 2004 before a three-member committee. (H 56.1 ¶ 39.) The committee unanimously recommended the reinstatement of Hudson's probationary employment.[1] (Id. ¶ 41.) District Superintendent Lloyd-Bey, the same person who initially decided to discontinue Hudson's employment, reviewed the committee report and decided not to follow its recommendation. (Id. ¶¶ 45-46.) Accordingly, Hudson received a letter notifying her that the discontinuance of her probationary employment had been reaffirmed. (Id. ¶ 47.) Hudson was not given any additional explanation of this action, nor was she informed of the committee's recommendation or provided with a copy of its report. (Id. ¶¶ 51, 53).

Hudson subsequently applied for work at a private school. During the application process, she was asked whether any of her teaching licenses had been terminated. After Hudson disclosed her termination, she was not hired. (Id. ¶ 61.) There is no evidence that the Department itself ever disclosed any information regarding the termination of Hudson's license to potential employers. (Def. H 56.1 ¶ 32.) Hudson eventually obtained work as a special education teacher at a private school in Astoria. (Id. ¶ 28.) At no time did she ever commence a proceeding under Article 78 of the New York Civil Practice Law to challenge any of Defendants' disciplinary actions. (Id. ¶ 30.)

---

[1] The committee did not specifically consider the termination of Hudson's license because the issue was not presented to it. The chair testified, however, that the committee would have also recommended reversal, since more serious misconduct is required for license termination than for a discontinuance. (Id. ¶ 43.)

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed separate complaints in November 2004, alleging the same causes of action. The parties consented to consolidate the cases for the purposes of discovery. On September 25, 2006, this court denied Plaintiffs' motion to consolidate the cases for trial purposes. (See Memorandum & Order dated September 25, 2006 (04-CV-05413: Docket Entry # 55; 04-CV-05414: Docket Entry #52).) The court also dismissed several of Plaintiffs' claims pursuant to Defendants' Rule 12(b)(6) motions. Previously, the court addressed Plaintiffs' claims in a single order because of similarities in the causes of action and the underlying facts. The court again adopts this approach.

## III.   LEGAL STANDARD

A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,'

since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. A grant of summary judgment is proper "when no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

Plaintiffs allege that Defendants deprived them of property and liberty without due process of law in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment of the Constitution. Specifically, Plaintiffs claim that Defendants deprived them of property by terminating their New York City teaching licenses and that Defendants deprived them of a liberty interest by terminating Plaintiffs' city licenses and placing them on the Department's "Ineligible List." Plaintiffs assert that, with respect to both deprivations, Defendants did not afford them the process to which they were constitutionally entitled.

Defendants move for summary judgment on four grounds: (1) Plaintiffs did not possess a property interest in their New York City teaching licenses; (2) even if Plaintiffs possessed property rights in their teaching licenses, they were provided all the process that was due; (3) Plaintiffs' claims for deprivation of liberty fail because Defendant made no public stigmatizing statements; and (4) even if Plaintiffs were deprived of a liberty interest, they were provided sufficient process. Plaintiffs likewise seek summary judgment on their property and liberty-based due process claims.

### A.    Due Process Analysis

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." To establish a

9

violation of due process, a plaintiff must (1) identify a constitutionally protected interest of which she was deprived by state action; and (2) show that she did not receive the process that was constitutionally due. See Zinermon v. Burch, 494 U.S. 113, 125 (1990) ("[T]he deprivation by state action of a constitutionally protected interest . . . is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.") (emphasis in original). The Due Process Clause applies to actions taken by a state in its capacity as an employer. See Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 626 (2d Cir. 1996), cert. denied, 519 U.S. 1150 (1997). Once a plaintiff has established that a state deprived her of a constitutionally protected interest, a court "asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988).

"Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). At the most fundamental level, due process ensures the right to be heard "at a meaningful time and in a meaningful manner." Goldberg v. Kelly, 397 U.S. 254, 267 (1970). The process due in a specific situation, however, is determined by the three factors outlined by the Supreme Court in Mathews: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation through the procedure used and the probable value of additional or substitute procedures; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. Mathews, 424 U.S. at 335.

As discussed below, the court does not decide whether Plaintiffs were deprived of protected liberty or property interests. Instead, the court concludes that, even if Plaintiffs were

deprived of constitutionally protected interests, they received all the process that is constitutionally due.

**B.    Property Claim**

    1.    Property Interest

The Fourteenth Amendment's protection of property is a "safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents v. Roth, 408 U.S. 564, 576 (1972). Property interests are defined by state law, yet the process due when they are deprived through state action is governed by federal constitutional law. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). Accordingly, while a state "may elect not to confer a property interest . . . it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate safeguards." Id.

New York City teaching licenses constitute a constitutionally protected property right insofar as they confer a "meaningful opportunity" to seek employment. See Rogovin v. N.Y. City Bd. Educ., No. CV-99-3382 (ERK), 2001 U.S. Dist. LEXIS 11923 at *13 (E.D.N.Y. Aug. 17, 2001); Lombard v. Board of Educ., 645 F. Supp. 1574 (E.D.N.Y. 1986). Defendants claim that hiring authority is centralized within the New York schools such that license termination is the functional equivalent of discontinuance of probationary employment.[2] (See (Defendants' Reply Memorandum – Hudson ("Def. H. Reply") 2). Under Chancellor's Regulation C-31, however, the Department can only terminate a license for enumerated reasons; the Department exercises greater discretion with respect to probationary employment. Plaintiffs have also offered evidence that, independent of employment at a specific school, a city license enables a teacher to

---

[2] There is no property interest in probationary employment. See, e.g., Longarzo v. Anker, 578 F.2d 469, 471 (2d Cir. 1978); Walsh v. Suffolk County Police Dep't, No. 06-CV-2237 (JFB), 2008 U.S. Dist. LEXIS 36465 at *21-22 (E.D.N.Y. May 5, 2008) ("It is well settled in New York that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any specific stated reason.").

seek work in the New York City public school system. (See B 56.1 ¶ 58; H 56.1 ¶ 60.) Accordingly, the opportunity conferred by a city teaching license is a genuine issue of material fact. The court thus proceeds to the question of whether, if a property interest indeed exists, Plaintiffs received the process that was constitutionally due.

### 2. Adequacy of Process Provided

Although the particular requirements of due process are situation-specific, "[g]enerally, due process requires that a state afford persons 'some kind of hearing' prior to depriving them of a liberty or property interest." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 299 (1981)). A pre-deprivation hearing rarely needs to be extensive or elaborate. See Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 466-67 (2d Cir. 2006) (citing Loudermill, 470 U.S. at 545-46). Where extensive post-deprivation process is provided, the basic pre-deprivation requirements are "oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." Gilbert v. Homar, 520 U.S. 924, 929 (1997).

In limited circumstances, however, significantly greater pre-deprivation process is required. The most notable example is welfare benefits, which the Supreme Court addressed in Goldberg v. Kelly, 397 U.S. 254 (1970). Plaintiffs seize upon Goldberg to support their argument that, prior to the termination of their licenses, they were entitled to a "full-blown evidentiary hearing, with a right to confront and cross-examine witnesses and a right to counsel." (H. Mem. 15.) Plaintiffs assert that "[d]eprivation of a teaching license, and its potential effect on the teacher's livelihood, is analogous to the effect the deprivation of welfare benefits can have on a welfare recipient." (Id. 11-12.)

12

While deprivation of a city teaching license is significant, it is hardly analogous to the deprivation of a welfare recipient's sole means of support. Indeed, both Behrend and Hudson secured other teaching jobs shortly after their city licenses were terminated. (Def. B 56.1 ¶ 26; Def. H 56.1 ¶ 28.) The question is not whether Plaintiffs received the pre-deprivation process due to the Goldberg plaintiffs, but whether they received process that was appropriate in the circumstances at issue.

In Loudermill, the Court described the pre-deprivation process due to a public school teacher whose employment is terminable only for cause. 470 U.S. at 545-46. Specifically, the teacher is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. The Court explained that a pre-deprivation hearing "need not purport to resolve the propriety of the discharge, but serves mainly as a check against a mistake being made by ensuring there are reasonable grounds to find the charges against an employee are true and would support his termination." Id. See generally R. Pierce, S. Shapiro, & P. Verkuil, Administrative Law and Process § 6.3, p. 289 (5th ed. 2009) ("[T]he Court's many post-Goldberg opinions now suggest strongly that welfare termination may be the only context in which due process compels an agency to provide a judicial-type trial before it takes an action that adversely affects an individual.") (emphasis in original).

Although Plaintiffs characterize the pre-termination process they received as "meager," (Hudson Reply in Support re Cross-Motion for Partial Summary Judgment ("H Reply") (Docket Entry # 135) 3) it more than satisfied the constitutional minimum. Plaintiffs received notice that their licenses might be terminated, the basis for the contemplated decision, and the opportunity to respond before any final decision was made. (See Def. B 56.1 ¶ 11; Def. H. 56.1 ¶¶ 9-10.)

13

Plaintiffs also had the opportunity to respond to each of the underlying criticisms of their teaching. (See Defendants' Rule 56.1 Counterstatement – Behrend ("Def. B 56.1 Counter") (Docket Entry # 129) 16; Defendants' Rule 56.1 Counterstatement – Hudson ("Def. H 56.1 Counter") (Docket Entry #126) 18.)

After Plaintiffs' licenses were terminated, extensive post-deprivation process was available to them, including proceedings under Chancellor's Regulation C-31 and Article 78 review under state law. See Koehler v. New York City, No. 04-CV-6929 (RMB), 2005 U.S. Dist. LEXIS 8901 at *17-19 (S.D.N.Y. May 11, 2005) ("[T]he pertinent inquiry is whether the administrative, union and state procedures available to Plaintiff satisfied due process.); Moore v. New York City Department of Education, No. 03-CV-2034 (LAP), 2004 U.S. Dist. LEXIS 5338 at *13 (S.D.N.Y. March 31, 2004) (plaintiff may challenge conclusions reached at C-31 review by commencing Article 78 proceeding).

Even accepting as true all of Plaintiffs' alleged deficiencies in the C-31 proceedings, Plaintiffs still were afforded sufficient process. The availability of state proceedings under Article 78 – which Plaintiffs chose not to pursue – constitutes sufficient post-deprivation process. See, e.g., Locurto, 264 F.3d at 174; Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996); Moore, 2004 U.S. Dist. LEXIS 5338 at *13; Goonewardena v. State of New York, 475 F.Supp.2d 310, 325 (S.D.N.Y. 2007).[3] Accordingly, the court concludes there is no genuine issue of material fact regarding the sufficiency of the procedure afforded to Plaintiffs – either before or after their licenses were terminated – and Plaintiff's property-based due process claims must be dismissed.

---

[3] In its last order, the court noted that Plaintiffs had alleged that they did not receive a hearing within the period of time envisioned by C-31. (See Memorandum & Order dated September 25, 2006 at 18). An unreasonable delay in post-deprivation procedures could indeed violate due process. Segal v. City of New York, 459 F.3d 207, 217 (2d Cir. 2006). Plaintiffs no longer appear to press this claim, nor do the facts support it.

## C. Liberty Claim

### 1. Liberty Interest

A plaintiff establishes the deprivation of a constitutionally-protected liberty interest by proving that (1) the government made stigmatizing statements about the plaintiff that call into question her good name, reputation, honor, or integrity; (2) these stigmatizing statements were made public; and (3) the stigmatizing statements were made concurrently with, or in close temporal proximity to, the plaintiff's dismissal from government employment. Segal v. City of New York, 459 F.3d 207, 212 (2d Cir. 2006). This is commonly referred to as a "stigma-plus" liberty claim. See id. at 209. Defendants contend that Plaintiffs have not satisfied the first two prongs of this test.

Plaintiffs claim that, while the exact grounds for the disciplinary actions against them were not made public, all the possible reasons for license termination are sufficiently stigmatizing that, upon learning of the Department's actions, a person would conclude that Plaintiffs were "at best grossly incompetent and at worst had committed an act or acts of serious misconduct that may include criminal behavior." (H Mem. 18.) Plaintiffs also argue that the second prong is satisfied by availability of the stigmatizing information in their personnel records and by "forced self-disclosure." (Id. at 19-22.) Because there are genuine factual disputes concerning the extent to which Plaintiffs were stigmatized, summary judgment is not appropriate regarding the deprivation of a constitutionally protected liberty interest. Accordingly, the court proceeds to consider whether, if Plaintiffs were deprived of a protected liberty interest, they received the process they were due.

2.    <u>Adequacy of Process Provided</u>

Plaintiffs argue that they were afforded insufficient process both before and after Defendants deprived them of constitutionally protected reputational liberty interests. Where an individual is deprived of a reputational liberty interest, she is entitled to process sufficient to refute the charges against her and salvage her reputation. <u>Codd v. Velger</u>, 429 U.S. 624, 627 (1977). This ordinarily entails a post-deprivation hearing, the purpose of which is "solely to provide [her] an opportunity to clear [her] name." <u>Id.</u>

It is unclear when, if ever, a pre-deprivation hearing is also required. <u>See</u> <u>Spang v. Katonah-Lewisboro Union Free Sch. Dist.</u>, 626 F. Supp. 2d 389, 397 (S.D.N.Y. 2009) ("Doctrine in this Circuit has oscillated between requiring post-deprivation and pre-deprivation hearings in stigma-plus cases.") (citing cases). The Second Circuit recently addressed this issue in <u>Segal</u>, 459 F.3d 207. The plaintiff in that case was a probationary teacher whose employment was discontinued upon accusations that she had subjected a student to corporal punishment. The Second Circuit stated, "[w]e now hold that, in this case involving an at-will government employee, the availability of an adequate, reasonably prompt, post-termination name-clearing hearing is sufficient to defeat a stigma-plus claim." <u>Segal</u>, 459 F.3d at 217.

In concluding that the plaintiff was not entitled to a pre-deprivation hearing, the <u>Segal</u> court applied the <u>Mathews</u> balancing test. <u>Id.</u> at 215. The court described the plaintiff's private interest as her reputation and future job prospects. <u>Id.</u> The court saw the government interest as its ability to execute and explain its personnel decisions quickly, and noted that this interest is particularly strong where an at-will employee is involved. <u>Id.</u> With respect to the third factor, the <u>Segal</u> court indicated that "[t]he risk inherent in a stigma-plus claim is the risk that the false charges against the plaintiff will go unrefuted and that [her] name will remain stigmatized." <u>Id.</u>

At least one court has read <u>Segal</u> as holding that no pre-deprivation procedure is required for <u>any</u> stigma-plus claim. <u>See</u> <u>Spang</u>, 626 F. Supp. 2d at 397. Plaintiffs, however, argue that <u>Segal</u> is not determinative of the process to which they were entitled because the Second Circuit did not specifically address the stigma associated with the termination of a teaching license. (<u>See</u> H Mem. 22.) The <u>Segal</u> court also distinguished two earlier Second Circuit cases that required a pre-deprivation hearing where a plaintiff also alleged the deprivation of a <u>property interest</u>. <u>See</u> <u>id.</u> at 217 (discussing <u>Velez v. Levy</u>, 401 F.3d 75 (2d Cir. 2005) and <u>DiBlasio v. Novello</u>, 344 F.3d 292 (2d Cir. 2003)). Here, the court has assumed that Plaintiffs' teaching licenses constituted protected property interests. Accordingly, it is possible that Plaintiffs were entitled to some pre-deprivation process.

Whether or not <u>Segal</u> is itself controlling, however, the requirements of due process turn on the application of the <u>Mathews</u> factors. Moreover, the relevant considerations are almost identical to those weighed by the Second Circuit in <u>Segal</u>. With regard to the first <u>Mathews</u> factor, Plaintiffs faced much the same reputational risks as the plaintiff in <u>Segal</u>. If anything, specific charges of corporal punishment are more damaging to a teacher's reputation than the termination of a license for undisclosed reasons. The considerations under the second and third <u>Mathews</u> factors are largely the same as in <u>Segal</u>. Even if the presence of a protected property interest tilts the balance in favor of <u>some</u> pre-deprivation process, Plaintiffs received constitutionally sufficient pre-deprivation process. Specifically, Plaintiffs received notice of the disciplinary actions they faced, their bases, and an opportunity to respond. <u>See, e.g.</u>, Koehler, 2005 U.S. Dist. LEXIS 8901 at *17-19 (notice and opportunity to be heard constitute sufficient pre-deprivation process for liberty claim).

The court turns to the sufficiency of the post-deprivation process available to Plaintiffs. In an effort to avoid Segal's conclusion that the C-31 review process constitutes adequate post-deprivation process, Plaintiffs argue that "[b]ecause there had been no actual Regulation C-31 hearing [in Segal], no record was developed as to how the Department actually administers such a hearing." (H Mem. 23-24.) Even if the process Plaintiffs received was infirm in all the ways that they describe, Plaintiffs would not be able to succeed on their claim. The availability of Article 78 proceedings alone constitutes sufficient post-deprivation process in the stigma-plus context. See, e.g., Spang v. Katonah-Lewisboro Union Free Sch. Dist., 626 F. Supp. 2d 389, 397 (S.D.N.Y. 2009); Koehler, 2005 U.S. Dist. LEXIS 8901 at *23-24.

Plaintiffs argue that "defendants systematically deny Regulation C-31 appellants information they need to challenge the result in an Article 78 proceeding by not providing the ultimate decision-maker's reasoning and by keeping the recommendations of the Committee a secret from appellant teachers." (H Mem. 30.) Yet Plaintiffs successfully obtained this information in the proceedings before this court and there is no basis for believing that they would not have been able to do the same in a state Article 78 proceeding. See N.Y. C.P.L.R. § 408 (discovery available in an Article 78 proceeding with leave of court). Accordingly, there is no genuine issue of material fact regarding the sufficiency of the procedures afforded to Plaintiffs and their liberty-based due process claims must be dismissed.

### D.     Lack of Authority

Finally, Plaintiffs allege that the Department could not revoke their New York City teaching licenses because no statutory authority exists for such action. This court disagrees and finds that the Chancellor's authority to issue and revoke teaching licenses is implicit in his statutory authorization to "enforce all provisions of law and all rules and regulations relating to

the management of the schools and other education, social, and recreational activities under the direction of the board of education." N.Y. Educ. Law § 2566(2). The Chancellor's delegation of decision-making authority in the review context was likewise proper pursuant to N.Y. Educ. Law § 2590-h, which empowers such delegation to any "subordinate officers or employees as [the Chancellor] deems appropriate."

## V. CONCLUSION

The court thus concludes that, even assuming that Plaintiffs were deprived of constitutionally protected property and liberty interests, they received all of the process to which they were entitled. Additionally, the court concludes that the Department acted within its statutory authority. Because there is no basis for liability on the part of the Department, there is no basis for liability on the part of individual Defendants. See Demoret v. Zegarelli, 451 F.3d 140, 148 (2d Cir. 2006). Accordingly, Defendants' motions for summary judgment are GRANTED and Plaintiffs' motions for summary judgment are DENIED. Plaintiffs' claims are dismissed with prejudice.

SO ORDERED.

s/Hon. Nicholas G. Garaufis

Dated: Brooklyn, New York
February 18, 2010

NICHOLAS G. GARAUFIS
United States District Judge